**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CRIMINAL ACTION NO. 13-12-DLB**

**UNITED STATES OF AMERICA**                                              **PLAINTIFF**

**vs.**                              **MEMORANDUM OPINION AND ORDER**

**BRADLEY LOCKLEAR**                                                      **DEFENDANT**

*** *** *** ***

## I. INTRODUCTION

This matter is before the Court on Defendant's Motion to Suppress (Doc. # 15) evidence seized from his vehicle during a traffic stop conducted on March 27, 2013 in Ashland, Kentucky.  After the matter was fully briefed (Doc. # 18), the Court held an evidentiary hearing to consider three issues: (1) whether the officer had probable cause to believe the Defendant committed a traffic violation, justifying the stop; (2) whether the officer detained Defendant for a reasonable amount of time; (3) and whether Defendant gave knowing and voluntary consent to search his vehicle.  Attorney Michael Curtis appeared on behalf of Defendant, who was also present.  Assistant United States Attorney Elaine Leonhard appeared on behalf of the United States.  At the conclusion of the hearing, the Court submitted the motion pending written decision.  For the reasons set forth herein, the Court will **deny** Defendant's motion.

## II. FINDINGS OF FACT

(1)     On the evening of March 27, 2013, Kentucky State Police Trooper Shane

Goodall, Trooper Zachary Thompson, and Detective Chris Kirk were patrolling the area around the bus station in Ashland, Kentucky, looking for suspected drug trafficking activity.

(2)     At approximately 8:40 p.m. that evening, Trooper Thompson called Trooper Goodall and advised him that an African American male carrying a backpack had left the bus station and walked to Katie's Corner, a local restaurant located nearby.  After waiting in the restaurant for some time, Trooper Thompson advised, the individual ran outside and jumped into a blue Jeep Grand Cherokee, which then sped off.

(3)     Trooper Goodall pulled behind the Grand Cherokee and noticed that it had a West Virginia temporary license plate which was worn and faded.  Trooper Goodall was able to see the license plate number and expiration date, but was unable to read the make, model and vehicle identification number (VIN),[1] which was handwritten on the side of the tag.  Trooper Goodall testified that he was unable to see this portion of the tag, in part, because the ink had faded.

(4)     Trooper Goodall stopped the Grand Cherokee because he felt the license plate was not legible as required by K.R.S. § 186.170(1).  As he exited his police cruiser and approached the Grand Cherokee, he was able to clearly read the make, model and VIN on the license plate.  Nonetheless, Trooper Goodall continued to the driver's side window to speak with the driver.

---

[1]  At the evidentiary hearing, Trooper Goodall testified that he was unable to see any of the information written on the side of the plate, though he did not specifically identify the make, model and VIN.  The Court, however, recognizes that this is the information that is always written on the side of the plate.  Trooper Goodall's other testimony confirms this conclusion.  Specifically, he explained that he uses the information written on the side of the plate to determine whether those descriptions match the vehicle.  This identifying information would have to be the make, model, and VIN, as it is always the identifying information on a temporary license plate.

(5)     Trooper Goodall asked the driver and passenger to produce identification. The driver, who was later identified as the Defendant, complied by handing Trooper Goodall his drivers license, registration and proof of insurance.  However, the passenger was not able to produce identification.

(6)     Trooper Goodall ordered the Defendant out of the vehicle.  He asked the Defendant how he knew the passenger and where the passenger was traveling from.  The Defendant responded that he had received a phone call from the passenger to pick him up, and that the passenger was traveling from Detroit, Michigan.

(7)     Trooper Goodall then confronted the passenger. He identified himself as Dominique Noland and explained that he was traveling from Toledo, Ohio.  Noland, however, was not able to produce his bus ticket to verify his city of origin because he had thrown it away at Katie's Corner.  With doubts about Noland's origin city, Trooper Goodall asked Detective Kirk to retrieve the ticket from the restaurant.  When Detective Kirk returned with the ticket, Trooper Goodall verified that Noland had actually traveled from Detroit, Michigan, in contradiction with his story.

(8)     At this point, both the Defendant and Noland were standing behind the Grand Cherokee.  Neither individual was in handcuffs, nor had they been told they were under arrest.  Approximately fifteen minutes had elapsed from the time of the initial stop.

(9)     After verifying that Noland was, in fact, traveling from Detroit, Trooper Goodall asked the Defendant whether he had anything illegal in the vehicle.  Defendant responded that he did not.  Trooper Goodall then asked the Defendant whether he would give consent to search the vehicle.  Defendant initially hesitated, prompting Noland to encourage Defendant to give consent.  Trooper Goodall then advised Defendant that "we could get a

dog if [you] would like us to, to come to the area" (Doc. # 21 at 13), and Noland again encouraged Defendant to give consent. Defendant then said that the officers "could go ahead and look in the vehicle." (*Id.*).

(10)   Having received consent from Defendant, Trooper Goodall proceeded to search the vehicle. He found a black backpack on the back seat and opened it. Inside, he found a large brick of a white substance, as well as a large bag of pills. Based on his suspicion that these were illegal narcotics, Trooper Goodall stepped out of the vehicle and told Trooper Thompson to place both the Defendant and Noland in handcuffs.

(11)   Upon hearing Trooper Goodall's command, Noland quickly sprinted away from the scene. Trooper Goodall chased him on foot to no avail. Trooper Goodall then returned to the Grand Cherokee and placed Defendant in handcuffs. According to the Uniform Citation, Defendant was arrested at 9:14 p.m.

## III.  ANALYSIS

### A.    Legality of the initial traffic stop

Defendant argues that the initial traffic stop violated his Fourth Amendment right to be free from an unreasonable search and seizure. The government responds that the stop was lawful because Trooper Goodall had probable cause to believe that Defendant violated K.R.S. § 186.170(1), which states in pertinent part:

> . . . Plates shall be kept legible at all times and the rear plate shall be illuminated when being operated during [designated hours]. . . .

In support of this assertion, the government points to Trooper Goodall's testimony that he was unable to read the make, model and VIN on the temporary tag because the ink had faded.

## 1.    Legal standard justifying a traffic stop

Sixth Circuit case law is in conflict about the amount of suspicion necessary to stop a vehicle for a civil traffic violation.  *United States v. Blair*, 524 F.3d 740, 748 n. 2 (6th Cir. 2008).  Some panels uphold a stop where the police had reasonable suspicion of a civil infraction, *see Weaver v. Shadoan*, 340 F.3d 398, 407-08 (6th Cir. 2003), while other panels require probable cause to believe a civil traffic infraction has occurred.  *See, e.g., United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000).  In *United States v. Simpson*, a published decision from 2008, the Sixth Circuit addressed a set of facts nearly identical those at issue here: the officer stopped a vehicle because the expiration date on the license plate was not "clearly visible" in violation of Tennessee statute.  520 F.3d 531, 533 (6th Cir. 2008).  The court noted that previous published decisions required probable cause to stop a vehicle for a civil traffic violation, but held that an officer only needs reasonable suspicion if the traffic violation is ongoing.  *Id.* at 541.  The court then concluded that an illegible license plate amounts to an ongoing traffic violation and, thus, analyzed the stop under the reasonable suspicion standard.  *Id.*  Despite the clear holding in *Simpson*, another Sixth Circuit panel—albeit in an unpublished decision—more recently analyzed a traffic stop based on a license-plate violation under the probable cause standard.  *United States v. Anderson*, 458 F. App'x 440, 441 (6th Cir. 2012).  Given the unsettled state of the law, and to ensure that the Defendant is afforded the greatest protection potentially required by Sixth Circuit jurisprudence, this Court will apply the more stringent probable cause standard.

The Supreme Court has refused to specifically define "probable cause."  *Ornelas v. United States*, 517 U.S. 690, 695 (1996).  However, the Court has stated that "the substance of all definitions of probable cause is a reasonable ground for belief of guilt, and

that the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal citations omitted). "To determine whether an officer had probable cause to [seize] an individual, [courts] examine the events leading up to the [seizure], and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id.*

## 2.    Scope of K.R.S. § 186.170(1)

The question for the court, then, is whether Trooper Goodall had probable cause to believe that Defendant was in violation of K.R.S. § 186.170(1). Before addressing that point, though, two other matters must be addressed: (1) whether the statute applies to temporary license plates and (2) whether the statute applies to out-of-state license plates. The statute does not address either of these issues, nor has a Kentucky court had the occasion to consider them. Thus, this Court must predict how the Kentucky Supreme Court would interpret the statute. *See Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) ("In construing questions of state law, . . . [i]f the state's highest court has not addressed the issue, the federal court must attempt to ascertain how the court would rule if it were faced with the issue.").

The Court answers the first question—whether the statute applies to temporary license plates—affirmatively. This conclusion is guided by the Sixth Circuit's decision in *United States v. Foster*, 65 F. App'x 41 (6th Cir. 2003). There, the court considered whether a temporary license plates must be illuminated at night pursuant to K.R.S. § 186.170(1). *Id.* at 44. The defendant argued that no Kentucky statute specifically required temporary license plates to be illuminated and that K.R.S. § 186.170(1) was inapplicable.

6

*Id.* The court rejected this reasoning, finding that the lack of a specific provision in the Kentucky code dealing with temporary license plates most logically meant that they were subject to the general statute. *Id.* Accordingly, the court held that K.R.S. § 186.170(1) requires temporary license plates to be illuminated during designated hours.

The Sixth Circuit's logic in *Foster* is persuasive here. No Kentucky statute specifically addresses temporary license plates. Moreover, there is no statute that exempts temporary license plates from the requirement of K.R.S. § 186.170(1), nor are Courts free to create exceptions to general statutory requirements. Norman J. Singer, STATUTES AND STATUTORY CONSTRUCTION, Vol. 2A, at §47:11 (6th ed. 2000). It is thus logical to conclude that the Kentucky legislature intended K.R.S. § 186.170(1), including its legibility requirement, to apply to both temporary and permanent license plates. After all, both temporary and permanent license plates share the same function of demonstrating that a vehicle is properly registered, and that function can only be served if both types of plates are legible.

The Court also finds that K.R.S. § 186.170(1) is applicable to out-of-state license plates. This holding is supported by the Sixth Circuit's decision in *United States v. Simpson*, 520 F.3d 531 (6th Cir. 2008). There, the court held that a Tennessee statute requiring "[e]very registration plate" to be "clearly visible" applied to out-of-state tags. *Id.* at 536. The court found that "the purposes of the statute (presumably to provide ready identification of motor vehicle traveling on Tennessee highways) would surely be frustrated if those passing through the state did not have to comply with this statute." *Id.* Additionally, the court noted that this holding was consistent with other state courts that have confronted the issue. *Id.* (collecting cases).

Much like the Tennessee statute addressed in *Simpson*, K.R.S. § 186.170(1) generally requires "[p]lates" to be "kept legible at all times." And as the *Simpson* Court held, "the purposes of the statute (presumably to provide ready identification of motor vehicle traveling on [Kentucky] highways) would surely be frustrated if those passing through the state did not have to comply with this statute." *Simpson*, 520 F.3d at 536. Therefore, the Court concludes that the Kentucky Supreme Court would likely find that K.R.S. § 186.170(1) applies to out-of-state license plates. *See also United States v. Foster*, 65 F. App'x 41, 44 (6th Cir. 2003) (finding officer had probable cause to believe that Illinois temporary license plate violated K.R.S. § 186.170(1)).

### 3. Trooper Goodall had probable cause to believe that the temporary license plate on Defendant's vehicle was in violation of K.R.S. § 186.170(1)

Trooper Goodall testified that he could not read the make, model and VIN on the temporary license plate because the ink was worn and faded (Doc. # 21 at 5-6, 8). Defendant contends that this justification is insufficient because it is "vague" and "non-descript to the statute." (Doc. # 15 at 3). According to Defendant, a license plate is illegible only if it is obscured or covered. He finds support for this interpretation based on the plaint text of the statute, which states:

> No rim, frame, or other covering around the plate shall in any way obscure or cover any lettering or decal on the plate; . . . .

K.R.S. § 186.170(1).

Defendant's interpretation confuses two distinct requirements in the statute. The statute first requires that license plates be kept "legible at all times." In the following sentence, the statute prohibits any "rim, frame, or other covering around the plate" that

8

obscures or covers lettering on the plate.  This latter sentence is a distinct prohibition; it does not narrow or modify the meaning of "legible" as used in the statute.  As a result, the legibility requirement may be violated in ways other than covering the license plate.

Although Defendant does not specifically raise the issue, the Court finds it prudent to address what the statute requires.  The statute states that "[p]lates shall be kept legible at all times . . . ."  K.R.S. § 186.170(1).  Because "legible" is not defined by the statute, it shall be interpreted in accordance with its ordinary, common meaning.  *Deutsche Bank Nt. Trust Co. v. Tucker*, 621 F.3d 460, 462 (6th Cir. 2010).  Merriam-Webster dictionary defines "legible" as "capable of being read or deciphered" or "capable of being discovered or understood by apparent marks or indications."  *Legible*, Webster's Third New International Dictionary, Unabridged, http:// unabridged.merriam-webster.com/unabridged/ legible (last visited Aug. 7, 2013).  Thus, a license plate must be "capable of being read or deciphered" at all times.

This leads to another question: what portion of the license plate must be capable of being read or deciphered at all times? The statute does not specifically identify any information that must be legible.  Instead, it more broadly requires that "[p]lates" shall be kept legible.  While few courts have had the occasion to interpret similar state statutes, at least one state court has interpreted this type of general language as requiring that all information on the license plate must be legible.  *Kansas v. Hayes*, 660 P.2d 1387, 1389 (Kan. Ct. App. 1983).

The Kentucky Supreme Court would likely agree with the *Hayes* Court's holding that all information on a license plate must be legible.   The information on a license plate—including the state, tag number and expiration date—helps police officers identify

vehicles and determine whether they are properly registered.  The additional information on temporary license plates—including make, model and VIN—is equally important to identifying vehicles.  As Trooper Goodall explained, the tag number on a temporary license plate is rarely registered to the vehicle.  The only way for officers to determine whether a temporary license plate belongs on a particular vehicle is to check that the make, model and VIN written on the plate matches the vehicle.  Because this information is vitally important to identifying a vehicle, the Kentucky Supreme Court would likely hold that it is subject to the legibility requirement of K.R.S. § 186.170(1).

This conclusion comes with a caveat: the make, model and VIN cannot be deemed illegible simply because they are written in small print.  Temporary license plates are printed by the state.  They generally include a small space for an automobile dealer to write the make, model and VIN of a newly-purchased vehicle.  If small handwriting were deemed to be a violation of K.R.S. § 186.170(1), then essentially no temporary license plate would be in compliance with the law.  More importantly, by providing a small space to write the make, model and VIN, the state would have created the very impediment that keeps individuals from complying with the law.  That cannot be what the legislature intended when it enacted this statute, nor could the Kentucky Supreme Court interpret the statute in such a manner.  *See* Norman J. Singer, STATUTES AND STATUTORY CONSTRUCTION, Vol. 2A, at § 45:12 (6th ed. 2000) ("Where literal enforcement of a statute will result in a great injustice which was not contemplated, a court will construe a statute to give effect to what must have been reasonably intended by the legislature."). As a result, while the make, model and VIN must be legible, they cannot be deemed illegible in violation of the statute simply because they are written in small font.

Here, Trooper Goodall testified that he could not see the year, make and VIN on the temporary license plate when he was directly behind Defendant's vehicle.  He explained that he could not see these details, in part, because the lettering was worn and faded. (Doc. # 21 at 8).  These observations gave Trooper Goodall probable cause to believe that Defendant was in violation of K.R.S. § 186.170(1).  Therefore, the initial traffic stop was reasonable under the Fourth Amendment.

### 4.    Void-for-vagueness challenge

Defendant also challenges the stop on the basis that K.R.S. § 186.170(1) is void for vagueness.  Although Defendant does not elaborate on this argument, he appears to suggest that if the statute is deemed unconstitutional, the Court must also rule that the traffic stop was unconstitutional and any fruits from the stop must be excluded.  However, Defendant's argument stretches the exclusionary rule too far.

The exclusionary rule is designed as "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation."  *Davis v. United States*, 131 S. Ct. 2419, 2423 (2011).  Its "sole purpose, [the Supreme Court has] repeatedly held, is to deter future Fourth Amendment violations."  *Id.* at 2426.  "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* at 2427 (internal quotations omitted).  "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rational loses much of its force, and exclusion cannot pay its way."  *Id.* at 2428 (internal quotations omitted).

The good-faith exception to the exclusionary rule has been applied in cases similar to the case *sub judice*. In *Illinois v. Krull*, 480 U.S. 340 (1987), an officer searched business records of defendant's business without any cause, but pursuant to a state statute that required licensees to permit state officials to inspect records "at any reasonable time during the night or day." *Id.* at 343. The state statute was ruled unconstitutional the day after the search. *Id.* at 344. The defendant relied on that ruling in his motion to suppress evidence gleaned from the business records, which the state court granted and the appellate courts affirmed. *Id.* at 344-45. The Supreme Court reversed the state court decision, finding that excluding evidence obtained pursuant to a statute that is subsequently declared unconstitutional "will not deter future Fourth Amendment violations by an officer who simply fulfilled his responsibility to enforce the statute as written." *Id.*

The Tenth Circuit Court of Appeals applied the principles announced in *Krull* to a case that is immediately analogous to arguments raised by Defendant here. In *United States v. Cardenas-Alatorre*, 485 F.3d 1111 (10th Cir. 2007), the officer stopped the defendant's vehicle, finding that it was in violation of a New Mexico statute requiring license plates to be kept "clearly visible and . . . free from foreign material and in condition that is clearly legible." *Id.* at 1112 (quoting N.M. Stat. § 66-3-18(A) (July 1, 1998)). The defendant argued that the stop was an unlawful seizure because it was based upon an unconstitutionally vague statute. *Id.* at 1113. The Tenth Circuit chose not to address whether the statute was void for vagueness, but instead determined whether the officer acted in good faith or in "objectively reasonable reliance" upon the statute. *Id.*

In concluding that the good-faith exception was applicable, the *Cardenas-Alatorre* Court found that the statute was not "'so grossly and flagrantly unconstitutional that any

person of reasonable prudence would be bound to see its flaws.'" *Id.* at 1117 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979)). The court acknowledged that New Mexico's legibility statute might not "be the most specific statutory command known to bar and bench." *Id.* But the court ultimately held that the statute was capable of at least one understanding that "would seem to channel and constrain the discretion of law enforcement at least to a sufficient degree" such that the court could not say that the statute lacks "minimal guidelines." *Id.* Therefore, the court ruled that officer acted in objectively reasonable reliance on the statute. *Id.*

Like the statute at issue in *Cardenas-Atlatorre*, K.R.S. § 186.170(1) is not so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. The statute requires license plates to be "legible at all times . . . ." K.R.S. § 186.170(1). "Legible" is a commonly used word that is capable of only one meaning: to be readable. While the statute does not precisely define "legible," a reasonable officer would not necessarily know that the word needs to be defined in order to pass constitutional muster. Rather, because "legible" is commonly understood, it would be objectively reasonable to believe that the word alone sufficiently sets forth the requirements of the statue. As a result, it was objectively reasonable for Trooper Goodall to rely on K.R.S. § 186.170(1) in stopping Defendant's vehicle.

## B. Length of the detention

In addition to challenging the initial traffic stop, Defendant also argues that Trooper Goodall violated his Fourth Amendment rights by ordering him out of the car and asking him questions beyond the scope of the stop. Additionally, Defendant contends that he was detained longer than necessary to effect the purpose of the investigatory stop, and his

13

detention therefore transformed into a de facto arrest that was not supported by probable cause. The government responds that Defendant's Fourth Amendment rights were not violated because the extraneous questioning was permissible and the duration of the stop was reasonable.

As an initial matter, Trooper Goodall lawfully ordered Defendant out of his vehicle after making the traffic stop. The Supreme Court has firmly established that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6 (1977). This rule protects the safety of the officer while causing a minimal intrusion on the driver, who has already been lawfully detained. *Id.* at 111.

Once Trooper Goodall ordered Defendant and the passenger out of the vehicle, he asked them a series of questions about where they were from and where they were going. Defendant explained that he was from West Virginia and had recently picked up the passenger from the bus station in Ashland. Trooper Goodall then questioned the passenger, who confirmed that Defendant had picked him up, and that he had arrived from Toledo, Ohio. However, the passenger was unable to provide his bus ticket because, as he explained, he had thrown it away at a nearby restaurant. Trooper Goodall then requested the assistance of Detective Chris Kirk, who found the passenger's bus ticket, which revealed that he traveled from Detroit, Michigan rather than Toledo, Ohio, piquing the officer's interest.

Police officers may inquire into matters unrelated to the justification of a traffic stop without converting the traffic stop into something other than a lawful seizure. *Arizona v.*

*Johnson*, 555 U.S. 323, 333 (2009). This rule has its limitations; officers may make unrelated inquiries so long as they do not "measurably extend the duration of the stop." *Id.* Minimal extensions are permitted. *United States v. Everett*, 601 F.3d 484, 492 (6th Cir. 2010). In applying this rule, the Court must "conduct a fact-bound, context-dependent inquiry," guided by the Fourth Amendment's ultimate touchstone of reasonableness, to determine whether "the totality of the circumstances surrounding the stop indicates that the during of *the stop as a whole*—including any prolongation due to suspicionless unrelated questioning—was reasonable." *Id.* at 493-94 (internal citations omitted).

The overarching consideration of the reasonableness inquiry is the officer's diligence. *Id.* In considering whether extraneous questioning indicates a *lack* of diligence, the court must consider both the scope and quantity of those questions. *Id.* "Context-framing questions," such as "the motorist's travel history and travel plans," rarely suggest a lack of diligence. *Id.* In other words, officers are permitted to ask general questions about "who, what, where, and why" regarding a suspects late-night travel without running the risk of unreasonably extending the duration of the stop. *United States v. Ellis*, 497 F.3d 606, 614 (6th Cir. 2007).

The Sixth Circuit has applied this principle to a set of facts that are analogous to those presented here. In *United States v. Jimenez*, 446 F. App'x 771 (6th Cir. 2011), the traffic stop lasted fifteen minutes before the defendant gave consent. *Id.* at 775. During those fifteen minutes, the officer "[ran] a check" on the defendant, asked him about his travel plans, and then attempted to verify the travel plans when they "didn't make sense." *Id.* The *Jimenez* Court held that the length of the stop was clearly reasonable, and that the officer's context-specific questions did nothing to unconstitutionally prolong the stop.

Here, like in *Jimenez*, approximately fifteen minutes elapsed between the initial stop and Defendant giving consent to search the vehicle. That amount of time is reasonable. *See id.*; *United States v. Guajardo*, 388 F. App'x 483 (6th Cir. 2010) (finding that twenty-five minutes between the initial traffic stop and defendant giving consent was reasonable). During that time, Trooper Goodall only asked Defendant and the passenger to identify themselves and explain their travel plans.[2] These are requests that the Sixth Circuit repeatedly deems as permissible within the course of a traffic stop. *Ellis*, 497 F.3d at 613-14; *see also United States v. Potts*, 173 F.3d 430, 1999 WL 96756 at *4 (6th Cir. 1999) (unpublished) ("It is well settled that an officer is free to ask traffic-related questions, and questions about a driver's identity, business and his travel plans during the course of a traffic stop."). As such, the questioning was neither extraneous, nor did it unreasonably extend the length of the stop.

## C. Consent

Finally, Defendant challenges the search of the vehicle. The government has responded that Trooper Goodall searched the vehicle pursuant to Defendant's consent. Defendant acknowledges he gave Trooper Goodall consent to search the vehicle, however he asserts that his consent was neither knowing or voluntary.

"Consent is a well-recognized exception to the Fourth Amendment's warrant requirement." *Peterson v. Smith*, 510 F. App'x 356, 364 (6th Cir. 2013) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990)). "The government bears the burden of proving, through clear and positive testimony that the consent to search was given voluntarily."

---

[2] Trooper Goodall's suspicions were confirmed when the passenger's bus ticket revealed he had lied about arriving from Toledo, Ohio.

*United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) (internal quotations omitted). This requires a showing that the consent was "'unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion.'" *Id.* (quoting *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008)). While the issue must be decided based on the totality of the circumstances, several factors may guide the analysis: the characteristics of the accused, including age, intelligence, and education; whether the accused understands his right to refuse consent and, more generally, his constitutional rights; the details of the detention, including its length and nature; the use of coercive or punishing conduct by police; and other forms of more subtle coercion. *Id.*

Here, the personal characteristics of the Defendant weigh in favor of the conclusion that the consent was voluntary. Trooper Goodall recalled that Defendant appeared to understand his questions, responded appropriately, and was forthcoming with information. Indeed, Defendant presented his drivers license upon request and stepped out of his vehicle when asked to do so. *See United States v. Valdez*, 147 F. App'x 591, 596 (6th Cir. 2005) (finding consent voluntary where Defendant "could understand, and interest with, [the trooper]" and "appropriately responded to questions about his destination and his relationship with [another individual]"). *United States v. Gamez-Acuna*, 375 F. App'x 809, 815 (10th Cir. 2010) (finding of consent supported by record that showed defendant was able to understand and respond to understand and appropriately respond to trooper's questions). Additionally, Defendant appeared to understand his constitutional rights, including his right to refuse consent. As Trooper Goodall explained, Defendant initially hesitated when he was asked to give consent to search. Although he was not advised that had the right to refuse consent, his hesitation at the initial request showed some

understanding that he was not required to give consent. Furthermore, Trooper Goodall's failure to advise Defendant that he had the right to refuse consent does not compel a finding that the consent was involuntary. Police are under no obligation to inform individuals that they have the right to refuse consent, *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999), and the failure to give consent is but one factor to be considered in the totality of the circumstances analysis. *United States v. Drayton*, 536 U.S. 194, 206-207 (2002).

The details of the detention also weigh in favor of finding that consent was voluntary. Trooper Goodall stopped Defendant for a minor traffic violation and asked him to step out of the vehicle. From the roadside, Trooper Goodall asked Defendant basic questions about his identify, his travel plans and those of his passenger. *See United States v. Watson*, 423 U.S. 411, 424-45 (1976) (finding that defendant's post-arrest consent from a public street rather than from the confines of the police station weighed in favor of finding that consent was voluntary). This entire process, to the time Defendant gave consent, took approximately fifteen minutes. *See Valdez*, 147 F. App'x at 596 (finding that a thirty minute detention was "brief" and not suggestive of a coercive atmosphere).

Moreover, there is no evidence of overt coercion or duress. Prior to giving consent, Defendant was never placed in handcuffs or otherwise physically restrained. Rather, he was standing on the roadway behind his vehicle. Additionally, there is no evidence that the troopers made any physical threats or promises to Defendant or his passenger. *See Watson*, 423 U.S. at 424-25 (holding that absence of any promises to the defendant or threat of force shows consent was voluntary).

Although Defendant has not raised the issue, the Court finds it prudent to address one final aspect of Trooper Goodall's interaction with Defendant.  When Trooper Goodall initially asked for consent, Defendant hesitated in responding.  Trooper Goodall then told Defendant, "we could get a dog if [you] would like us to, to come to the area."  (Doc. # 21 at 13).  Upon hearing this question, Noland—the passenger—encouraged Defendant to allow the officers to search the vehicle.  Defendant then gave consent.

Other courts have addressed instances where a defendant's consent was preceded by a mention that police could bring a drug detection dog to the scene.  For instance, in *United States v. Hawthorne*, 982 F.2d 1186 (8th Cir. 1992), the Eighth Circuit found that consent was voluntary despite the fact that officers told the defendant that "[he] did not need to give permission for the search, that they could wait until the drug detection dog arrived, and then if the dog alerted to the bag, the detective would try to obtain a search warrant."  *Id.* at 1191.  The court found that these circumstances were not "so inherently coercive that they vitiated [the defendant's] consent.  *Id.*  Instead, the court found that other facts showed that the defendant's consent was the product of his own free will: he was not handcuffed and was sitting in a car with a door open; officers did not accuse him of carrying drugs, nor did they display a weapon; officers were standing on the opposite side of the vehicle when consent was given.  *Id.*

Other courts have found that consent was involuntary when it was preceded by threat to bring a drug detection dog to the scene.  In *United States v. Page*, 154 F. Supp. 2d 1320 (M.D. Tenn. 2001), the defendant initially refused to allow the officers to search his vehicle.  *Id.* at 1324.  Based on his refusal, the officer told the defendant that they had a narcotics detection dog on scene that would search the vehicle.  *Id.* "At that point, the

defendant said 'go ahead and search.'" *Id.*  The court found that the officer "conveyed to the defendant [his] erroneous belief that he had the legal authority to order a drug sniff of the vehicle . . . and that he intended to do so." *Id.* at 1328-29.  For that reason, the court held that the defendant's consent was nothing more than a response conveying an expression of futility in resistance to authority. *Id.*

The Eighth Circuit Court of Appeals addressed a similarly coercive threat in *United States v. Morgan*, 270 F.3d 625 (8th Cir. 2001).  There, the officer told the defendant that he would walk a narcotics detection dog around the vehicle if she did not consent to the search, to which the defendant responded, "go ahead." *Id.* at 631.  Without any analysis, the court held that this consent was not voluntary. *Id.*

Trooper Goodall's suggestion that he could bring a dog to the scene was unlike the statements made in *Page* and *Morgan*.  In each of those cases, the officer unequivocally threatened to have a dog sniff the vehicle if the defendant refused to consent.  That did not occur here.  Rather, Trooper Goodall asked Defendant if he would give consent and then *asked* Defendant if he would prefer to call a canine to the scene.  In other words, Trooper Goodall did not create the impression that he would have the car subjected to a canine sniff if consent was refused.

This case is also distinguishable from *Page* in two additional ways.  In *Page*, the defendant initially refused consent and then changed her mind once the officer threatened to allow the canine to sniff the vehicle.  Additionally, the canine was already on the scene and it was apparent that the officer was prepared to allow the sniff. Under those circumstances, it was clear that the threat *alone* caused the defendant's free will to be overcome by police coercion.  Here, in contrast, Defendant had not refused consent prior

to Trooper Goodall suggesting that he could summon a canine. In fact, as Defendant was considering Trooper Goodall's request for consent, Noland—the passenger—twice told Defendant to allow the police to search the vehicle. Moreover, unlike *Page*, there was no canine on the scene at the time Trooper Goodall made the statement, nor did his statement suggest that he was going to call for a canine if consent was refused.

The facts at issue here are more akin to those in *Hawthorne*. Defendant was not handcuffed when he gave consent, but was standing freely behind his vehicle. The troopers had not brandished a firearm or used any other force. Additionally, officers did not accuse Defendant of carrying drugs, but instead asked simply whether there was anything illegal in the vehicle.

The Court therefore concludes that Defendant's free will was not overcome by Trooper Goodall's suggestion that he could bring a canine to the scene. At best, Trooper Goodall's suggestion had a minimal impact on Defendant's decision to consent; it certainly did not "critically impair[ ] Defendant's "capacity for self determination." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). Rather, considering the totality of the circumstances, including Defendant's personal characteristics, his understanding of his rights, the nature and length of the detention, and Noland's advice to allow the police to search, the Court finds that Defendant gave knowing and voluntary consent. Thus, Trooper Goodall lawfully searched Defendant's vehicle.

## IV. CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1)     Defendant's Motion to Suppress (Doc. # 15) is hereby **DENIED**;

(2)     The time period between July 19, 2013 and August 30, 2013, totaling forty-two (42) days, is deemed "excludable time" pursuant to 18 U.S.C. § 3161(h)(1)(D);

(3)     This matter is set for a **Final Pretrial Conference** on **September 9, 2013 at 9:30 a.m. in Ashland**; and

(4)     This matter is set for a **Jury Trial** on **October 15, 2013 at 1:00 p.m.**, with the attorneys present at 12:30 p.m.

This 30th day of August, 2013.



Signed By:

*David L. Bunning*

United States District Judge

G:\DATA\ORDERS\Ashland Criminal\2013\13-12 MOO denying Defendants motion to suppress.wpd